UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LONNIE GIPSON,

    Petitioner,

v.

SUZAN L. HUBBARD, Warden,

    Respondent.

No. C 06-5463 SI (pr)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

This matter is now before the court for consideration of the merits of Lonnie Gipson's pro se petition for writ of habeas corpus. For the reasons discussed below, the petition will be denied.

## BACKGROUND

The California Court of Appeal described the criminal episode that led to Gipson's conviction:

> On December 8, 2001, at about 6:51 a.m., defendant's brother, Wallace Gipson (Wallace), . . . awoke to hear defendant arguing with Ijuana Tucker in the hall of their home. Tucker was yelling, "stop, stop." Wallace left his room to see defendant hitting Tucker with a beer bottle while she was trying to leave the residence. Wallace intervened. Defendant hit Wallace over the head with the beer bottle, which broke. Defendant advised Wallace to "mind your own business" while following him into his room and attempting to stab him with the broken end of the beer bottle. Wallace felt blood, looked in a mirror, and saw cuts and bumps on his face. He called the police. Wallace's injuries included lacerations to the head and face, a bump near the top center of his forehead, and a fracture in the first knuckle of his ring finger.

Resp. Exh. H, California Court of Appeal Opinion, p. 2 (footnote omitted).

Following a jury trial in Santa Clara County Superior Court, Gipson was convicted of assault with a deadly weapon or by means of force likely to produce great bodily injury (for the attack on Wallace Gipson) and of misdemeanor assault and misdemeanor battery (for the attack on Ijuana Tucker). The court found true the sentence enhancement allegations that Gipson had suffered two prior convictions and had served two prior prison terms. Gipson was sentenced to a total of 17 years in prison.

The California Court of Appeal affirmed the conviction and rejected Gipson's habeas petition. The California Supreme Court denied his petitions for review and writ of habeas corpus.

Gipson then filed his federal petition for writ of habeas corpus. His petition alleged that: (1) the trial court erred in not finding an equal protection violation when the prosecutor peremptorily challenged three African-American prospective jurors; (2) the prosecutor engaged in misconduct by introducing false evidence at trial; (3) his trial attorney provided ineffective assistance of counsel; and (4) his appellate attorney provided ineffective assistance of counsel. The court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer. Petitioner filed a traverse. The matter is now ready for decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, in this judicial district. 28 U.S.C. §§ 84, 2241 (d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

A.   Prosecutor's Use of Peremptory Challenges

The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution forbids peremptorily challenging potential jurors solely on account of their race. See Batson v. Kentucky, 476 U.S. 79, 89 (1986). Batson permits prompt rulings on objections to peremptory

1  challenges under a three-step process. Id. at 96. First, the defendant must make a prima facie
2  showing that the prosecutor has exercised peremptory challenges on the basis of race. Id. at 96-
3  97. That is, the defendant must demonstrate that the facts and circumstances of the case "raise
4  an inference" that the prosecution has excluded venire members from the petit jury on account
5  of their race. Id. at 96. Second, if the requisite showing has been made, the burden shifts to the
6  prosecutor to articulate a race-neutral explanation for striking the jurors in question. Id. at 97;
7  see Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000). Finally, the trial court must
8  determine whether the defendant has carried his burden of proving purposeful discrimination.
9  See Batson, 476 U.S. at 98. In evaluating the race-neutral explanation, the court must keep in
10 mind that proof of discriminatory intent or purpose is required to show a violation of the Equal
11 Protection Clause. See Hernandez v. New York, 500 U.S. 352, 355-62 (1991) (no discriminatory
12 intent where Latino jurors were dismissed because of possible difficulty in accepting translator's
13 rendition of Spanish language testimony); Purkett v. Elem, 514 U.S. 765, 768 (1995) (ultimate
14 burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent
15 of the strike).

16     Gipson contends that the trial court erred in not finding an inference of discrimination in
17 the prosecution's peremptory excusal of three African Americans on the jury panel. This court
18 interpreted Gipson's contention to be an equal protection claim under Batson. 5/11/07 Order at
19 5. Gipson asserts that the only three African Americans in a panel of 60 were peremptorily
20 challenged. See Resp. Exh. K, p. 0069. However, he provides no other information about his
21 Batson claim, such as the number of other prospective jurors who were peremptorily challenged
22 (each side was permitted to exercise up to twenty peremptory challenges, Exh. B, RT 45), the
23 number of African Americans among the remaining 40 potential jurors who were not called, or
24 whether the African American jurors who were stricken had characteristics favorable to the
25 prosecution or characteristics the same as prospective jurors of other races who were not stricken.
26     The voir dire and jury selection was not transcribed, apparently because there was no
27 challenge to the jury selection procedure. RT 50, 53. This court can make few determinations
28 from the extremely limited record that exists in this case. The record shows that there was to be

4

a panel of 70 individuals, from which 30 prospective jurors would be voir dired and peremptories could be exercised, and the first twelve unobjected-to jurors would be seated. RT 45. The trial court minutes show that 30 prospective jurors were voir dired and subjected to peremptory challenges. Twelve jurors and two alternates were selected to be sworn in for the trial. See CT 128-129. It is impossible for this court to find any indication that the prosecutor exercised peremptory challenges based on race given the lack of information. Obtaining the transcript of the voir dire and jury selection process would be of little use since no objection was ever made at trial. Resp. Exh. K at pp. 0055, 0057.

This case is distinguishable from Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir. 2006), cert. denied, 127 S. Ct. 2249 (2007), where the California courts denied the Batson motion at trial and denied defendant's request for a transcript of the voir dire for use on appeal. Boyd held that the state courts violated clearly established federal law by denying the petitioner's habeas petition because "without an entire voir dire transcript, those courts could not evaluate the relevant circumstances surrounding the contested strike, as Batson requires." Boyd, 467 F.3d at 1142. Unlike the situation in Boyd, Gipson did not make a Batson objection at trial or even request a transcript of the voir dire and jury selection. A transcript would not contribute to analyzing the Batson claim as it would almost certainly not reveal the race of prospective jurors.

Although the substantive right at issue in Batson is the right to equal protection, Batson is most remembered for the procedure it set out for evaluating the peremptory challenge to ultimately determine whether that substantive right was violated. "The analysis set forth in Batson permits prompt rulings on *objections* to peremptory challenges without substantial disruption of the jury selection process." Hernandez, 500 U.S. at 358-59 (emphasis added). A timely objection allows the trial judge to take immediate steps to evaluate the claim, to correct any errors quickly, and to ensure the development of a complete record for appellate review. Id. at 281-82 & n.6.

> [A Batson inquiry] involves an evaluation of the prosecutor's credibility and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not

> only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.

Snyder v. Louisiana, 128 S. Ct 1203, 1208 (2008).  Deference is accorded the trial judge because "these determinations of credibility and demeanor lie peculiarly within a trial judge's province." Id.  The absence of any objection here precludes meaningful evaluation of the claim under Batson.

Even if the claim were analyzed as an equal protection claim without the use of the Batson procedure, it would fail.  The only information Gipson provides is that three African American jurors were peremptorily challenged.  Showing that three minority prospective jurors were challenged is not alone enough to satisfy his burden to show the discriminatory intent or purpose necessary for an equal protection violation.  If showing the race of the challenged jurors were enough, Batson would be at most a 1-step procedure rather than a 3-step procedure.  The state appellate court's rejection of Gipson's claim cannot be said to be contrary to or an unreasonable application of, clearly established Supreme Court authority, as it must be to justify habeas relief under § 2254(d).

B.      Prosecutorial Misconduct

       1.      Use of "Incompetent" Witness

Gipson alleges that his due process rights were violated when the prosecutor improperly introduced the testimony of his brother, Wallace, who was an "unreliable mental patient," and who was allowed by the prosecutor to falsely tell the jury that Gipson hit him with a beer bottle. Petition, p. 5. Wallace told one story immediately after being injured (i.e., that Gipson had hit him and Ijuana) and a different story at trial (i.e., that Gipson had not hit him or Ijuana).

Gipson first contends that Wallace should not have been allowed to testify at all because of his substance abuse and mental health problems. Wallace admitted during cross-examination that he used drugs (including heroin) since he was about 16 years old, periodically used cocaine, and routinely consumed alcohol.  RT 117-118.  Wallace also was mentally ill.  He testified that he had been under psychiatric care for "depression and emotional asthma," RT 118, had tried to

6

kill himself about 5 times, RT 119, and had taken medications for psychiatric problems for years, including Paxil and Zyprexa at the time of the incident, RT 119-120. Wallace also testified that his depression sometimes caused him to forget things, and sometimes he had auditory and visual hallucinations. RT 128. The trial judge indicated a concern that there might be an invasion of Wallace's privacy if the mental health medical records were introduced, but withheld a ruling depending on the witness' testimony. RT 66-67. Wallace's mental health treatment records were not introduced at trial.[1]

Gipson's counsel relied on Wallace's mental illness and drug abuse to explain why Wallace initially told the police that Gipson had hit him in the head with the beer bottle. Wallace testified that he falsely told police that Gipson had hit him because he was angry that Gipson did not give him money to purchase drugs. Wallace testified at trial that what actually happened was that the beer bottle accidentally flew out of Ijuana's hand and hit him in the head.

The California Court of Appeal explained (in the process of rejecting an ineffective assistance of counsel claim) that the "testimony about factors affecting Wallace's competency including his drug and alcohol use, past mental hospitalizations and delusions, and his mental state at the time of the incident were adequately disclosed to the jury so as to allow it to judge Wallace's credibility." Cal. Ct. App. Opinion, p. 6-7.

The veracity or competence of a witness is generally a matter of state law and not a federal question. See Schlette v. California, 284 F.2d 827, 834-35 (9th Cir. 1960), cert. denied, 366 U.S. 940 (1961). Under California law, "a witness must be allowed to testify unless he or she (1) cannot communicate intelligibly, (2) cannot understand the duty of truthful testimony, or (3) lacks personal knowledge of the events to be recounted." People v. Anderson, 25 Cal. 4th 543, 574 (Cal. 2001); see Cal. Evid. Code § 701. "The fact that a witness has made inconsistent and exaggerated statements does not indicate an inability to perceive [or] recollect." People v. Willard, 155 Cal. App. 3d 237, 240 (Ct. App. 1983). "Unsoundness of mind does not per se establish the

---

[1] Gipson attached some of Wallace's medical records to his habeas petition in the California Supreme Court. One of those records showed that Wallace had an Axis I diagnosis in 1997 of a major depressive disorder with psychotic features. Resp. Exh. J, at San Mateo County General Hospital 10/1/97 history & physical notes, p. 2.

7

incompetency of the witness." People v. Ives, 17 Cal. 2d. 459, 476 (Cal. 1941); see also People v. Dennis 17 Cal. 4th 468, 525 (Cal. 1998).

Gipson has not shown that Wallace's substance abuse problems and mental illness made him incompetent to be a witness under California law. He has not shown that Wallace could not communicate intelligibly or could not understand the duty to testify truthfully. A review of the transcript does not lead one to conclude that the witness was unintelligible or unable to understand what was asked of him. Although Wallace did not remember several details of the event in question, he did recall enough to demonstrate to the jury that he was aware of what had happened that night. He was able to discern that his story at trial was different from what he had told to the 9-1-1 operator, the responding police officer, and the physician's assistant who treated his wounds, and tried to explain why his story had changed. Since there was evidence that the witness had the capacity to perceive, recall, and narrate, the determination whether he did perceive and does recall properly was left to the trier of fact. Using the victim as a witness, even though that victim had mental health problems and substance abuse problems, did not violate Gipson's right to due process.

2.  Use of "False" Testimony

Gipson urges that the prosecutor improperly presented evidence to the jury that Wallace said that Gipson hit him with a beer bottle. Gipson's reasoning and evidentiary presentation are quite simple on this claim: since he didn't hit Wallace, Wallace's statement that he did hit him must be false.

A fundamental principle guiding the conduct of the prosecutor, as the representative of a sovereign in this country, is "not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935). From this principle flow the rules that the prosecutor may not hide evidence and may not let false evidence go uncorrected at trial. Cf. Strickler v. Greene, 527 U.S. 263, 280-82 (1999). When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, the conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury. See

1  United States v. Agurs, 427 U.S. 97, 103 (1976); Napue v. Illinois, 360 U.S. 264, 269 (1959)
2  (same result obtains when State, although not soliciting false evidence, allows it to go uncorrected
3  when it appears). To bring a successful claim of prosecutorial misconduct for use of false witness
4  testimony, Gipson must show that: (1) the testimony (or evidence) was actually false, (2) the
5  prosecution knew or should have known that the testimony was false, and (3) that the false
6  testimony was material. United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003) (citing
7  Napue v. Illinois, 360 U.S. at 269-71); see also Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005)
8  (prosecutor's action in presenting false evidence to the jury and by failing to correct the record
9  violated petitioner's rights). However, prosecutors are not held accountable for discrepancies in
10 testimony where there is no evidence from which to infer prosecutorial misconduct and the
11 fairness of the trial was not materially affected. See United States v. Zuno-Arce, 44 F.3d 1420,
12 1423 (9th Cir.), cert. denied, 516 U.S. 945 (1995) (no evidence of prosecutorial misconduct where
13 discrepancies in testimony could as easily flow from errors in recollection as from lies).

14        Gipson's claim that the prosecutor knowingly presented false testimony is meritless. First
15 and foremost, Wallace's testimony at trial was actually favorable to Gipson – it was the story
16 Wallace told immediately after the incident that was unfavorable to Gipson. Acceptance of
17 Gipson's allegation that the prosecutor elicited false testimony from Wallace would provide little
18 help to him because that was the statement that was favorable to Gipson. Second, although
19 Wallace told two different stories and one of them was false, Gipson has not shown that the
20 prosecutor knew or should have known that the first story Wallace told was the false one.
21 Wallace's statements immediately after the incident were more consistent with the injuries he had
22 suffered – including a lump on the top of his forehead and cuts on his face, as well as a fractured
23 ring finger – than was his trial testimony. Wallace's testimony that Ijuana's beer bottle accidentally
24 flew out of her hand and hit him in the head was not believable, especially in light of the velocity
25 that would be needed for the bottle to break and cause numerous cuts on his face. Also
26 undermining the believability of the accident story were Ijuana's prior inconsistent statements
27 about where she was standing when Wallace emerged from the room, and the fact that the bottle
28 of beer that landed on Wallace's head was Gipson's usual brand (40-ounce King Cobra) rather than

1  Ijuana's usual brand (Miller). Gipson's prompt departure from the house immediately after the
2  bottle broke over Wallace's head also was more consistent with him hitting Wallace than the bottle
3  hitting Wallace accidentally. Based on the police account, the 9-1-1 call transcript, and the
4  physician's assistant's report, the prosecutor had sufficient basis to believe that Wallace had been
5  hit by Gipson. At its core, Gipson's claim is nothing more than a denial that he hit the victim and
6  the corresponding proposition that the witness who said otherwise was lying. Sorting out this kind
7  of witness credibility issue is one of the routine chores of the jury on its way to a verdict. Gipson's
8  claim that the prosecutor knowingly used false testimony has no merit.

C.   Assistance of Trial Counsel

   Gipson contends that his attorney deprived him of effective assistance of counsel at trial when she failed to argue to the jury that Wallace was mentally incompetent and did not have the capacity to tell the truth, and failed to argue that the prosecutor used false evidence. In his traverse, Gipson asserts that counsel also was ineffective for not making a Batson objection.

   The California Court of Appeal rejected Gipson's claims that his trial counsel had been ineffective. "Wallace's mental state was adequately disclosed to the jury via the testimony of defense witnesses." Cal. Ct. App. Opinion, p. 6. Johnny Gipson (who was Wallace's brother), Lynne Ramblin (who was Wallace's niece), and a police officer testified about another middle-of-the-night incident when Wallace falsely accused Lynne's boyfriend of attacking him or Lynn because he was mad about a debt not being repaid by Lynne. Id. at 6. Johnny testified that Wallace was a nice but unstable person. Wallace's sister testified that Wallace had mental problems, had visual and auditory hallucinations, and used drugs. She also testified that Wallace threw tantrums, stole and lied in connection with his drug abuse. A local Safeway employee testified that Wallace was a regular panhandler in the store's parking lot who got agitated and angry and yelled at customers who failed to give him money. The state appellate court concluded that this testimony allowed the jury sufficient basis to judge Wallace's credibility.

   The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for

10

1  judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper
2  functioning of the adversarial process that the trial cannot be relied upon as having produced a just
3  result. Strickland, 466 U.S. at 686. In order to prevail on a Sixth Amendment ineffectiveness of
4  counsel claim, Gipson must establish two things. First, he must demonstrate that counsel's
5  performance was deficient and fell below an "objective standard of reasonableness" under
6  prevailing professional norms. Id. at 687-88. Second, he must establish that he was prejudiced
7  by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for
8  counsel's unprofessional errors, the result of the proceeding would have been different." Id. at
9  694. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
10 Id.

### 1.     Counsel's Failure To Challenge Wallace As A Witness

Gipson argues that counsel failed to argue to the jury that Wallace was mentally incompetent and did not have the capacity to tell the truth. Petition, p. 6. Although counsel did not make this precise argument, such an argument would not have been proper. If there was a competency problem with the witness, that would be a matter for the trial judge and not for the jury to consider. See Cal. Evid. Code §§ 405, 701. In any event, even if counsel did not argue to the jury that Wallace was incompetent, she did vigorously challenge the veracity of Wallace's statements immediately after the bottle hit his head. Defense counsel argued that Wallace's statements and testimony showed many discrepancies and that he had a bad memory. RT 340. She also argued that Wallace was a drug addict, was mentally ill, and had admitted he lied. In her closing arguments, defense counsel adequately challenged Wallace's statements to police.

Gipson fails to understand that Wallace's *testimony* was essential to his defense  His attorney used Wallace's testimony to try to show that Wallace's statements immediately after he was hit in the head with the beer bottle were false, and were the product of a mentally unstable drug user mad at a brother who would not give him money to buy drugs. Defense counsel emphasized that Wallace acted this way because he was not a "stable, rational person" and was a drug addict. RT 344-45. If Wallace had not testified, Gipson's counsel would not have been

11

able to introduce evidence that was intended to show the motive for Wallace to lie to the 9-1-1 operator, the police officer, and the health care provider. Wallace's contradictory stories presented a dilemma for defense counsel as to how to get the jury to believe Wallace's current version was the truth and his first version was false. This could not be accomplished with Gipson's proposed approach of arguing that he was incompetent and should not testify at all. Counsel chose a more nuanced approach that tried to offer a version of the beer bottle incident that exonerated Gipson by providing a motive for Wallace to have told a false story that day. Counsel did not engage in deficient performance by making that choice. Her strategy relied on portraying Wallace as an unstable and irrational individual who frequently lied and became angry when he did not obtain the money he requested to purchase drugs. Arguing that Wallace was too mentally incompetent to testify would have prevented Wallace from testifying that he was injured accidentally by Ijuana and not by Gipson.

Further, it can be said with certainty that no prejudice resulted from counsel not pursuing the line of defense Gipson proposes. Gipson's strategy would not have succeeded in excluding all of Wallace's statements (for the reasons discussed in section B.1 above regarding witness competency), would have left the jury with no potentially exculpatory version of the incident from Wallace and would have required the entire defense to rest on Ijuana's testimony. Ijuana's testimony of an accident was not very convincing in light of her uncooperativeness with police who arrived at the house in response to the 9-1-1 call.

### 2. Counsel's Failure To Argue Prosecutorial Misconduct

The second alleged mistake of trial counsel was that she "failed to argue that the prosecutor used false evidence." Petition, p. 6. As explained in Section B.2 above, there was no prosecutorial misconduct. Counsel therefore did not engage in deficient performance and Gipson was not prejudiced by her failure to argue prosecutorial misconduct.

### 3. Counsel's Failure To Assert A *Batson* Challenge

The third alleged mistake of trial counsel was that she did not challenge the prosecutor's use of peremptory challenges. See Traverse, p. 4. This claim fails for lack of a showing of deficient performance and prejudice. As to the deficient performance prong, even at this late date, Gipson does not state that there was a discriminatory challenge, but only that there was "possible discrimination." Traverse, p. 4. With there only being a possibility of a discriminatory peremptory challenge, he has not shown that a reasonably competent defense attorney would have asserted a Batson challenge.

Also, Gipson does not show the necessary prejudice. Even where the underlying problem is a structural error like a Batson error, a petitioner claiming that his attorney was ineffective for not making the objection must show prejudice under Strickland. That is, a petitioner faulting counsel for failing to raise a Batson objection at trial must show a reasonable probability that a different jury would have decided the case differently. See Young v. Bowersox, 161 F.3d 1159, 1160 (8th Cir. 1998). The Ninth Circuit has not squarely addressed this issue but in similar situations has required prejudice to be shown. For example, in Thomas v. Borg, 159 F.3d 1147, 1151-53 (9th Cir. 1998), the court rejected an ineffective assistance of counsel claim based on counsel's failure to assert that there was an under-representation of African Americans in the jury list from which jury venires were assembled. Although this is different from a Batson claim, the Thomas court did not presume that there was a systematic under-representation but instead considered whether the defendant would be able to demonstrate this and would be able to establish a reasonable probability that the result of the trial would be different if the jury were "perfectly representative of the community." Id. at 1152. After examining the strength of the evidence against the petitioner, the court concluded that, in light of the "overwhelming evidence of guilt, it is difficult to see how a different jury would have reached a different result." Id. Cf. Vansickle v. White, 166 F.3d 953, 959 (9th Cir. 1999) (to excuse a procedural default for failing to object to a denial of a full allotment of peremptory challenges, the petitioner had to demonstrate a reasonable probability that the outcome of the case would have been different if he had been allowed to use additional peremptories to alter the eventual composition of the jury; petitioner

13

could not do this because the evidence against him was overwhelming); but cf. Williams v. Woodford, 396 F.3d 1059, 1060 (9th Cir. 2005) (Rawlinson, J., dissenting from denial of rehearing en banc) (analyzing ineffective assistance of counsel claim based on failure to assert a Batson claim with the assumption that Batson error would have been established if counsel had not failed to object).

Even if a different jury had heard this case, there is no reasonable probability that the result would have been different.  Reading the record leaves one with two firm impressions: (1) the evidence was strong that Gipson had hit Wallace in the head with a beer bottle, and (2) in their trial testimony, Ijuana and Wallace were trying to help Gipson rather than trying to tell the truth. Without doubt, Wallace was a witness with many problems, but even highlighting his many mental health and substance abuse problems couldn't overcome the other evidence.  The injuries to his head more consistent with his original story than his trial testimony and other circumstances pointed to him having suffered these injuries while trying to stop an incident of domestic violence. There were contemporary reports by Wallace to the 9-1-1 operator, the police officer, and the health care provider accusing Gipson of hitting him with the bottle.  His testimony at trial that was exculpatory to Gipson was not convincing.  Ijuana's testimony at trial was exculpatory to Gipson but also was not convincing in light of her uncooperative attitude toward police (in which she refused to say what happened and would not let them inspect her arms for bruising) which was consistent with the prosecutor's theory that this was an incident of domestic violence between Ijuana and Gipson that Wallace tried to stop.  Gipson has not demonstrated a reasonable probability that the outcome of the case would have been different if the prosecutor's peremptory challenges had been disallowed or if a new jury had been seated.  The ineffective assistance of counsel claims fail on both prongs of the Strickland test.

D.     Assistance of Appellate Counsel

Gipson contends that appellate counsel deprived him of effective assistance of counsel on appeal in that he: (1) "failed to disclose to the court that the prosecution used petitioner's priors conviction[s];" (2) failed to raise trial counsel's ineffectiveness regarding the alleged Batson claim;

14

and (3) failed to argue that the "prosecutor had coerced a mental patient to give false testimony evidence against petitioner[.]"  Petition at 6.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A petitioner thus must show that counsel's failure to raise claims fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the petitioner would have prevailed on appeal.  Id. at 1434 n.9 (citing Strickland, 466 U.S. at 688, 694).  In that regard, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  Id. at 1434.  Consequently, appellate counsel frequently will remain above an objective standard of competence and have caused his client no prejudice where he declines to raise a weak issue.  Id.

Gipson makes a muddled claim that appellate counsel was ineffective by not informing the court that the prosecutor used Gipson's prior convictions: "Counsel only raised issues relating to appellant prior criminal arrests and conviction from a case 11 years old that has nothing to do with the appellant conviction now in superior court case #BB155724 a 2001 case."  Resp. Exh. K. at 0096.  Although it is unclear what Gipson is referring to, the trial court was informed of Gipson's prior convictions and Gipson knowingly waived his right to a jury trial regarding his prior convictions.   See RT 315, 391, 393.  He has not shown that there was a meritorious legal argument for appellate counsel to assert with regard to his prior convictions.

The other claims of deficient performance by appellate counsel fare no better.  The claim that appellate counsel failed to assert that trial counsel was ineffective in not making a Batson challenge fails for the reasons discussed in sections A and C.3 above.  The claim that appellate counsel failed to assert that there was prosecutorial misconduct in the use of Wallace's testimony fails for the reasons discussed in section B above.  Gipson is not entitled to the writ on his claims of ineffective assistance of appellate counsel.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

DATED: February 20, 2009

_____
SUSAN ILLSTON
United States District Judge